(No. 3633—

HELEN TURNER, ADMINISTRATOR OF THE ESTATE OF ROY TURNER, DECEASED, DARRELL C. MCCLEARY AND MARY STACK, CLAIMANTS, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed September 22, 1942.*

A. J. B. SHOWALTER, ALBERT TUXHORN AND CHARLES E. KELLER, (O. L. MCCASKILL, of counsel) for claimants.

GEORGE F. BARRETT, Attorney General; ROBERT V. OSTROM, Assistant Attorney General, for respondent.

ECKERT, J.

About seven-thirty o'clock in the evening of October 5, 1940, on State Route 39 between Mahomet and Champaign, Illinois, a collision occurred between a car driven by Roy Turner, deceased, and a car driven by Darrell C. McCleary. A six-inch depression in the concrete pavement, which had existed for more than three weeks prior to the accident, and of which the respondent had notice, caused the Turner car to swerve to the right and then to the left across the black line in the center of the highway. It crashed into the on-coming McCleary car, in which the claimant, Mary Stack, was a guest. There was no sign, no barricade, no light to warn motorists of this defect in the pavement.

As a result of the accident, Roy Turner, a young man twenty-eight years of age, in excellent health, regularly employed and earning $60.00 per week was killed. He was supporting a wife and a five year old daughter. The wife, Helen Turner, as administrator of his estate, seeks an award in the amount of $10,000.00.

Darrell C. McCleary was cut and bruised about the head, face, and neck, and suffered a fracture of the right lower jaw, which penetrated the ear canal wall, and set up a temporary infection. At the time of the accident he was earning $120.00 per month, but was unable to return to his employment for three and one-half months. He has expended $235.00 for medical services, $118.70 for hospital services, and has sustained a total loss of his automobile. He suf-

fered, however, no permanent injury. He seeks an award of $3,000.00.

Mary Stack, a young woman thirty years of age, in perfect health before the accident, and employed at a salary of $8.00 per week, was permanently injured and disfigured. She received a serious skull fracture and a permanent, painful injury to her eye. Her face is also permanently disfigured. She has paid $324.00 for medical services, $225.21 for hospital services, and $120.00 for nursing services. She is required to undergo a further operation at a cost of approximately $250.00, and faces the possibility of being financially dependent upon others for the rest of her life. She seeks an ward of $10,000.00.

Claimants allege that the negligence of the respondent, in failing to erect proper warning signs, or in failing to repair the depression, was the proximate cause of the accident. There was no contributory negligence on the part of any of the claimants, or on the part of the deceased, Roy Turner. Respondent moved to dismiss the complaint on the ground that the State, in the exercise of a governmental function, is not liable for the negligence of its officers, agents, or employees; that this court has jurisdiction to make an award only in those cases where the State would be liable at law or in equity in a court of general jurisdiction were it suable. The court having indicated its desire to consider the motion with the testimony, the case proceeded to hearing. At the close of claimant's testimony, respondent renewed its motion to dismiss, and the case is now before the court on that motion.

The motion of the respondent rests upon the decision of this court in *Crabtree* vs. *State*, 7 C. C. R. 207, in which it was held that Section (4) of paragraph (6) of the Court of Claims Act defines the jurisdiction of the court and does not create a new liability against the State nor increase or enlarge any existing liability; that the jurisdiction of this court is limited to claims in respect of which the claimant would be entitled to redress against the State either at law or in equity if the State were suable; that this court has no authority to allow any claim unless there is a legal or equitable obligation on the part of the State to pay the same; that unless a claimant can bring himself within the provisions of a law giving him a right to an award, he can not invoke the principles of equity

and good conscience to secure such an award. Claimants contend that this decision, which has been uniformly followed since 1933, is contrary to the intent of the Legislature as expressed in the Court of Claims Act, is contrary to sound policy, and is not binding upon, and should not be followed by the present members of the court.

The Constitution of the State of Illinois, adopted in 1870, (Article 4, Section 26), provides that the State shall never be made defendant in courts of law or equity. It makes no provision for payment of claims against the State, and the Legislature itself considered such claims until 1877, when a Commission of Claims was established for that purpose, succeeded in 1903 by the Court of Claims. Since that time it has been frequently contended that the Legislature, in creating the court, intended to authorize payment of all claims thought to be just and equitable without regard to principles of law followed by courts of general jurisdiction; that the State, having no legal liability under the Constitution, claims made against it should be determined only by generally just and moral principles.

In its earlier decisions, however, the court made awards only to claimants having such legal or equitable claims against the State as would have been recognized in courts of general jurisdiction were the State in fact suable. The court repudiated the contention that it was created to make awards regardless of the law otherwise applicable in courts of general jurisdiction. It held that the Legislature, in creating the court, intended that claims made against the State should be heard and determined as such claims would be heard and determined if it were possible for claimants to proceed in the general courts; that the Legislature, recognizing that the State was not, in the strict use of the term, liable in any case, nevertheless desired the court to determine the State's accountability as if the Constitutional prohibition did not exist. The court early adopted the use of the term "liability" in reference to the State with this Legislative intent in mind, and denied contentions that it was created to make awards regardless of such legal liability. *Schmidt* vs. *State,* 1 C. C. R. 76; *Henke* vs. *State,* 2 C. C. R. 11; *Jorgenson* vs. *State,* 2 C. C. R. 134; *Morrisey* vs. *State,* 2 C. C. R. 254; *Looney* vs. *State,* 3 C. C. R. 18; *Gillett* vs. *State,* 3 C. C. R. 95. The court recognized the fact that the Legislature

itself could make awards without regard to a legal or equitable cause of action, but held that it did not intend the court to do likewise. Frequently, in the earlier cases, claims were denied without prejudice to claimants to seek an award directly from the Legislature. *Looney* vs. *State,* supra; *Gillett* vs. *State,* supra.

The decisions remained uniform until 1920, when a claim was allowed on the basis of equity and justice without regard to a legal or equitable cause of action. *Good* vs. *State,* 4 C. C. R. 90. Thereafter many awards were made on general principles of equity and good conscience; others were denied. It is difficult to determine what guided the court in separating those cases which came within the principles from those which did not. When this inconsistency became apparent to the court, it endeavored to define justice and equity. *Perry* vs. *State,* 6 C. C. R. 81. This, however, proved unsatisfactory, and in 1932, in *Lindsey* vs. *State,* 7 C. C. R. 103, the court denied an award on the grounds of equity and good conscience because no gross carelessness or wanton negligence was shown on the part of the respondent. Shortly thereafter, in *Pachesa, et al.* vs. *State,* 7 C. C. R. 123, an award was made on the grounds of equity and good conscience, gross negligence being shown on the part of the respondent and no contributory negligence appearing on the part of the claimant. From its attempts to limit the broad field of equity and good conscience in the Perry case, the court reached the limitations in the Pachesa case. These were followed in *Miller* vs. *State,* 7 C. C. R. 129; *Cavender* vs. *State,* 7 C. C. R. 199; *Sprague Dairy Company* vs. *State,* 7 C. C. R. 227; *Connole, et al.* vs. *State,* 7 C. C. R. 232.

In the decision in the Crabtree case, the court returned to its earlier holdings. Since that decision, it has consistently held, that regardless of the power of the Legislature, to pay claims on its own initiative, this court can exercise only such authority and power as has been delegated to it by the Act creating it, and that by the Act, awards are limited to cases in which the claimant would be entitled to redress against the State either at law or in equity if the State were suable. In tort cases, it followed the common law and held that the doctrine of respondeat superior had no application to the State in the exercise of its governmental functions. *Kelly* vs. *State,* 9 C. C. R. 339.

The claimants in this case, recognizing the numerous opinions and authorities which support the motion of the respondent, and admitting that they reflect a pattern followed by this court for many years, contend that they are opinions of outgoing members of this court which were expressly a repudiation of the opinions of their predecessors. Claimants contend that if precedent was not binding upon the prior members of this court, it is not binding upon the present members. They contend that, although the decisions of the court so far as practicable should be uniform, the rights of litigants here are not dependent upon uniformity as in courts of law and equity, because litigants in this court have in fact no rights to assert, but are merely suppliants of such dispensation as the Legislature may properly make. They conclude that the doctrine of *stare decisis* has no application to the Court of Claims.

It is true that the doctrine of *stare decisis* should not be blindly followed. It is highly desirable that courts remain flexible, but it has always been considered of greatest importance that there be a consistent body of precedent in the law. The law must not remain static, but neither must determinations of the law vary from day to day or from year to year. When this court followed the loose doctrine of equity and good conscience rather than precedent, awards to all intents and purposes were based upon the eloquence of counsel, upon the influence of claimants, or upon the sympathies of the court. This was highly undesirable from the point of view of the State, of claimants, of counsel, and of the court.

All the age-old arguments as to the value of precedent are as applicable to the Court of Claims as to courts of general jurisdiction, and the fact that a claimant against the State of Illinois can not, under the Constitution, make the State defendant in a court of law or equity, does not lessen the need for precedent. The Legislature, harrassed with claims of all sorts in increasing number and complexity, established a tribunal to hear and determine claims against the State, not in a haphazard fashion, but according to established legal and equitable principles. The fact that the original Commission of Claims was composed of a Judge of the Supreme Court and two Circuit Judges of the State, is indicative of the Legislature's desire to have such claims

heard and determined by the same law applicable to them in courts of general jurisdiction were it not for the Constitutional prohibition. The Legislature indicated like intent when it abolished the Commission of Claims in 1903 and established the Court of Claims. Lack of precedent, lack of judicial standards, and lack of legal and equitable principles in the consideration and determination of claims made against the State were evils which the Legislature endeavored to abolish. It is to the benefit of all concerned that this court follow sound precedents in its decisions, which in turn may be guides for prospective claimants and their counsel, and which may merit the confidence of the Legislature itself. The doctrine of *stare decisis* should be followed by this court to the same extent and for the same reasons it is followed by courts of general jurisdiction throughout the English-speaking world.

Considerable emphasis is placed by the claimants upon the fact that the outgoing members of the court were all appointees of the late Governor Horner; that the Crabtree case was one of their first decisions; and that bills passed by the Legislature, making awards on claims not first presented to the Court of Claims were vetoed by the Governor. The contention is made, that whether the doctrine of the Crabtree case originated with the Governor or with his appointees, by executive order it became a fixed doctrine of the administration, and as such explains all the subsequent decisions. Such an explanation is not borne out by the facts.

Claimants concede that the question is one of legislative intent. It appears, however, that the members of the Legislature, cognizant of the decisions of the court, have recognized the limitations of its jurisdiction. In 1935, House Bill No. 576 passed both Houses of the Illinois Legislature; it provided that the Court of Claims should have the power:

"To hear and determine all claims and demands, legal and equitable, liquidated and unliquidated, ex-contractu and ex-delicto, which the State, as a sovereign commonwealth, should discharge and pay. To hear and determine all claims and demands, legal and equitable, liquidated and unliquidated, ex-contractu and ex-delicto, in respect of which the claimant would be entitled to redress against the State, if the State were suable. Where any person has suffered damage as a result of the performance by the State of any of its governmental functions, the doctrine of *respondeat superior* shall not apply; *provided, however,* that the court shall have the power to allow claims in cases now pending, or hereafter brought in said court to recover damages from the State for the death or injury of any person, or for the injury to or

destruction of property, caused by the wilful and wanton act or conduct, or the negligence of an employee of the State while acting in the course of his employment, where there is no contributory negligence upon the part of such injured claimant."

The bill was vetoed by the Governor because its provisions were "directly contradictory and impossible of interpretation," a criticism conceded to be just.

On March 15, 1937, House Bill No. 405 was introduced by the majority leader of the House. This was an Act to amend Section (6) of "An Act to Create the Court of Claims, and to Prescribe its Powers and Duties," and sought to add to paragraph (4) of Section (6) of the Act the following:

"In cases now pending or hereafter brought in said court wherein claims against the State for damages on account of death or permanent injury of persons other than employees of the State are made, the court shall have power to allow such claims when the death or permanent injury is caused by wilful and wanton negligence of an employee of the State while acting in the course of his employment, and when the person killed or permanently injured is guilty of no contributory negligence."

This bill was ordered to the Committee on Judiciary, and was reported out of the committee with recommendation that it do pass. It was passed on April 14th; on June 5th, Governor Horner filed his veto message. The Legislature was then still in session, but there was no attempt to override the veto. Since that time, the Legislature has met at its regular sessions and has held several special sessions; no efforts have been made to indicate that the opinion of the court in the Crabtree case and those subsequent thereto are a "misinterpretation," or a "complete misunderstanding" of the doctrine of "equity and good conscience" mandate in the Court of Claims Act, or a "repudiation and misinterpretation of said Act" as claimants allege.

In Governor Horner's veto of House Bill No. 405, he stated:

"If this bill were to become law, it would only be the first step in extending the responsibility of the State for the acts of its employees. Next, it would be made liable in case of simple negligence. Later, it is conceivable that the fact that a State employee was involved in the accident might be made prima facie evidence of negligence on his part . . . For the several reasons I have stated, I am convinced that House Bill No. 405 is against sound public policy, and I therefore veto and withhold my approval from it."

Prior to the introduction, passage, and veto of this bill, House Bill No. 908, making an appropriation to the estate of Adolph Pelli, was introduced by the Honorable Louie

Lewis on April 13, 1935, and ordered to the Appropriation Committee. It was reported out of the committee on June 6th with recommendation that it do pass. The bill was passed by the House, on June 27, 1935, and on June 29th it passed the Senate and was sent to the Governor. It was vetoed on July 10, 1935. In his veto message, the Governor said:

"The court refers to its own records and to the decisions of other courts to sustain itself in denial of this claim. (*Lillian Pelli, Admrx.* vs. *State of Illinois,* 8 C. C. R. 524).

"It discusses the theory of 'equity and good conscience' and says that 'the facts in this case would appeal to the good conscience of any court, but public policy has long established, and the court is committed to the rule that the State can not be held to respond in damages arising out of the negligent acts of its employees or for injuries suffered by patients in its various penal and charitable institutions.'

"The facts in this case do appeal to our sympathy, but as the Governor of this State, I realize what great danger lies in the establishment of a precedent that will open the State Treasury to claims for damages for the 'negligent acts of State's employees or for injuries suffered by inmates of its penal and charitable institutions.' To depart now from the long established policy of the State by approving this claim I should be setting a precedent the consequences of which might be disastrous to our State."

It is to be noted that the Court of Claims had refused to give an award in the Pelli case although it was there alleged that a deceased inmate of a State institution had died from the effects of an attack by other patients. An autopsy had disclosed many fractured ribs and other bones of the deceased, and three attendants were discharged for abuse of the patient. Two physicians had been reprimanded and penalized for lack of diligence. In referring to this opinion, the Governor said:

"The Court of Claims has heard the evidence in this case, and has denied the claim in an opinion, the soundness of which can not be questioned. The court deals with the claim on legal grounds. It calls attention to the long established policy of this State in such matters and adds that the 'State can not be properly asked to respond in damages for injuries sustained by any inmate of such institutions, whether due to the acts of other inmates or of attendants or employees therein.'"

Both House Bill No. 405 and House Bill No. 908 were heard in committee, and the Governor's veto messages were available for discussion by members of the Legislature. It may reasonably be inferred that the Legislature disagreed with neither the arguments of policy made by the Governor, nor with the construction which the court placed upon the Act creating it. The fact that the Legislature subsequently

took no affirmative action is certainly some indication that the decisions of the court have not been contrary to its intent.

Furthermore, the Legislature, from time to time when it desired to do so, has extended the jurisdiction of the court giving it jurisdiction of claims of State employees under the Workmen's Compensation Act, of claims of officers and enlisted men under the Military-Naval Code, giving it jurisdiction of claims of State employees under the Workmen's Occupational Diseases Act, and making provisions for refunds of various license fees erroneously paid. If the court's jurisdiction were unlimited, such legislation would have been unnecessary. The Legislature apparently has not regarded the court merely as a court of conscience, but rather as a court which it established to determine legal and equitable causes of action against the State. If the Legislature has been burdened, as claimants allege, because the opinions of the court have restricted its usefulness to the Legislature and thrown the burden upon the Legislature itself to determine if there is "equity and good conscience" in the multitude of cases which the court has dismissed, the Legislature has failed to complain. Apparently it has not found, as claimants contend, that the opinions of this court have compelled a resort to partisan wire-pulling and political influence as a substitute for thorough investigation, in an orderly and impartial manner.

Claimants also contend that it is immaterial whether the Legislature acknowledges a liability or not, because the Legislature can not give consent to be sued; that liability is a private law concept; that the cases which respondent cites are a confused and fallacious mixing of private and public law concepts; and that to say the State, in the exercise of a governmental function, is not liable, is a mixture of legal concepts, because if the State can not be liable at all, it can not be liable whatever function it performs. Claimants contend that a distinction between governmental and private functions is made by the courts only as to defendants who are suable, but never as to defendants who are non-suable.

For generations, however, it has been an established rule of law that the doctrine of respondeat superior does not apply to a sovereign. If there were no Constitutional prohibition, and the State could be made defendant in courts of general jurisdiction, the doctrine of respondeat superior would not

be there applied to the State. Whether this be socially desirable or not, is a legislative and not a judicial question. There is nothing in the Court of Claims Act from which this court can even infer that the Legislature intended it to disregard this long established principle. No matter what may have been the language of the decisions or the terminology used, it is clearly evident that both the Legislature and the court have recognized that the State is liable to no one, but that it is highly desirable for the State to respond in damages in those cases in which it would be liable were it not for the Constitutional prohibition. Nothing in the Court of Claims Act indicates that the Legislature considered it desirable for the State to respond to any greater extent. Citizens generally are presumed to know the law; certainly the same presumption must be applied to the members of the Legislature, and to an even greater degree. It must be presumed that the Legislature knew that the doctrine of respondeat superior, in courts of general jurisdiction, was not applicable to a sovereign. Courts have consistently held that sovereign immunities can be waived only by express legislative action. *People* vs. *Oregon Savings Bank*, 357 Ill. 545.

Knowing the long history of the protection and immunity of a sovereign, if the Legislature intended such immunity should be waived when considering claims against the State, it had only to provide that the doctrine of respondeat superior apply to the State in claims heard and determined in the Court of Claims. The Legislature made is possible by the Court of Claims Act for claimants against the State to obtain an award in those cases in which claimants might obtain judgment against the State were it suable in courts of general jurisdiction, in the absence of such a statute. The Legislature has not, however, by any statute, abrogated the sovereign prerogative of the State in the consideration of claims by the Court of Claims, nor made applicable to it the doctrine of respondeat superior.

Claimants also contend that the Act creating the Court of Claims itself creates whatever responsibility the State, by whatever terminology, has undertaken; that the Act creating the Court of Claims likens the State's honorable obligation to the obligation it imposes upon its citizens in the courts, and for that reason adopts court terminology; that the State does not impose one standard of justice for

its citizens and a different standard for itself, but imposes a respondeat superior obligation on its citizens and assumes such obligation for itself, restricting the State only to claims which the State should pay in "equity and good conscience."

The question whether the State should have a less or greater liability than individuals, however, is entirely a matter of Legislative policy. Whether there should be one standard of conduct for the citizen and another for the State is a question of public policy and of legislative intent. This court originally held that it could make awards only in those cases in which the claimants would be entitled to redress either at law or in equity if the State were suable in courts of general jurisdiction. Subsequently, it arbitrarily made awards without regard to legal or equitable causes of action, but after wandering in an obscure, bottomless, nether world, it returned to a sound interpretation of the law creating it. Despite the learned and persuasive arguments of counsel, the court is still of the opinion that the Legislature, in creating the Court of Claims, intended that it should make awards only in those cases in which the claimant would be entitled to redress against the State either at law or in equity if the State were suable.

The Legislature has so far determined that the greatest good to the greatest number of citizens of this State is best served by limiting the jurisdiction of this court to claims founded upon a legal or equitable cause of action against the State, and by retaining in the consideration of such causes of action in this court its sovereign immunity from responsibility for the torts of its officers, agents or employees. The motion of the respondent is therefore granted, and the case dismissed.